IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
NORFOLK DIVISION

BMK SOLUTIONS, LLC,

    Plaintiff,

v.                                            CIVIL NO. 2:15cv150

BIOSTAT, LLC,

    Defendant.

## OPINION & ORDER

This case came before the Court on the Amended Complaint filed by BMK Solutions, LLC ("BMK" or "Plaintiff") and the Amended Answer filed by BioStat, LLC ("BioStat" or "Defendant"). ECF No. 12; ECF No. 15. On April 6, 2015, Plaintiff sued Defendant alleging breach of a contract for goods for nonfulfillment by the seller, BioStat. In the alternative to its claim for breach of contract, the BMK alleged unjust enrichment or tortious conversion by BioStat for failure to return two initial deposits. Ultimately, BMK sought a judgment in its favor for the amount of the initial deposits plus interest. BioStat claimed in the alternative that the BMK had previously breached the contract for sale by anticipatory repudiation.

The Court **FINDS** that BMK did not breach the contract and that BioStat breached the contract for sale of goods by nondelivery. Therefore under Va. Code § 8.2-711, the Court **AWARDS** recovery to BMK for the price paid in the amount of $201,080.00 with interest at six percent per annum from June 27, 2014. Va. Code § 6.2-302. The Court **FINDS** that the Defendant suffered no damages and attempted to be enriched unjustly the payments in

1

controversy, but it is unnecessary to rule on the unjust enrichment claim presented by Plaintiff as there was a clear breach of contract by the Defendant. Similarly, the Plaintiff's tortious conversion claim is also foreclosed by clear breach of contract. The Court's findings of fact and conclusions of law are set forth below.

## I. FINDINGS OF FACT

The findings herein are based upon the evidence presented at trial. Where factual conflicts in the evidence existed, the findings here are the facts the Court has determined the more credible.

### A. THE PARTIES

BMK Solutions, LLC ("BMK" or "Plaintiff") is a Virginia limited liability company with its principal place of business in Virginia Beach, Virginia. BMK is a company that primarily engages in fulfilling government contracts, specifically in the production of medical kits and like products. BioStat, LLC ("BioStat" or "Defendant") is a Florida limited liability company with its principal place of business in Orlando, Florida. BioStat, at the time of the conduct in question, was the exclusive North American distributor of Medtrade Products, a British company which manufactured gauze and bandage products.

### B. THE PURCHASE ORDERS

The parties began negotiation for a larger contemplated agreement for consignment, distribution, and sale in January 2014. BioStat, the exclusive distributor of Medtrade product, seemingly sought a warehouse and fulfilment partner to effectively distribute these products in the United States. BioStat had been without such a distributor for several months, and claimed that it had outstanding orders to be fulfilled but lacked the infrastructure to store and ship orders after the end of its previous distribution contract. BMK had the needed infrastructure and wished to include Medtrade products within the medical kits it produced. BMK was Tactical Combat

Casualty Care ("TCCC") certified which allowed it to sell to combat unites of the U.S. Armed Forces. BioStat was no so certified, and the process of certification takes months to complete. BioStat was not TCCC certified until shortly before it breached the contract.

While negotiations for this contemplated agreement were underway, but prior to any formalized agreement, the parties negotiated a large purchase of products. In an email dated January 15, 2014 Mark Geier, the CEO of BioStat, wrote to Peter Campbell, the consultant for BMK who was attempting to negotiate the final contemplated agreement. In the email, entitled "Initial Stocking," Geier questioned Campbell about the status of the financing for the initial order of products by BMK. As Geier summarized from the parties' previous oral discussions, "The order we discussed last week was approx $343K total, which requires a first stage payment of approx $170K," then asked if BioStat might go ahead with that order. Later that day, Campbell responded with estimates of the products, quantity, cost per unit, and expected payments.

Brian Miliken, the CEO of BMK, finalized contract between the companies two days later, when he sent a purchase order to Geier. In the email forwarding the purchase order, Miliken stated the following,

> Here's our PO to get started. It was a Pleasure to meet you on the phone yesterday. Looking forward to meeting you guys in person. Let me know how you would like to handle payment. Have a great day and I'll talk to you soon.
>
> BioStat will utilize BMK inventory for all orders over 100 units, but on occasional basis fill orders out of limited BioStat inventory.
> BMK will be the only authorized distributor to have on a GSA schedule
> BMK will maintain a quarterly stocking level of $250,000

Attached to this email was a purchase order, Purchase Order No. 1535 ("First Purchase Order"). This First Purchase Order contained a description of products, quantity, rate, and amount for an order totaling $397,700. The expected ship date was listed as January 24, 2014, the terms were

3

"Due on Receipt," and the "Ship To" section of the purchase order provided BMK's address. Geier, for BioStat, immediately responded to Miliken's email with wiring instructions for the $159,080, but went on to dispute the summary of interim terms between the parties. Geier wrote, "We will endeavor to utilize BMK for orders over 100 units, but you are likely to find that a quarterly stocking level of $250K in product will be insufficient for that mission. Let mutually keep tabs on inventory with an eye to adjust as necessary moving forward."

The first contract between the parties had thus been formed for the sale of $397,700 in products. On January 20, 2014, BMK made the initial payment totaling $159,080 to BioStat by wire transfer (herein First Initial Payment). This payment was in partial fulfilment of the First Purchase Order amounting to approximately forty-percent of the total contract price.

On January 24, 2014, BioStat having pocketed the $159,080, did not ship the product. Instead of shipping the goods as set forth in the First Purchase Order, BioStat, through Geier, contacted BMK about a different potential purchase order. In email, Geier wrote,

> We have sales of the 4x4 and 8x8 EMS products and we want to run them through the "BMK system" rather than set up a separate mechanism. Retail on those two products would be $13 for the 4x4 and $15 for the 8x8, with a target for ultimate GSA being $12 and $14 respectively.
>
> BMK pricing would be $7.50 for the 4x4 and $8.75 for the 8x8.
>
> I would like to add those two items to our "agreement in progress" and initiate a purchase order to cover the sales we have in process. It would amount to approx $82K on the PO with a deposit of $41K.

Thus BioStat admitted an ongoing prearranged sale to an ultimate user of the product, and was proposing that BMK process the shipment of these orders and make a nice profit. After an oral conversation, Geier again wrote Campbell at BMK that he would get the product numbers and purchase order in place in the next week, then followed only fifteen minutes later with the appropriate product numbers.

4

For the proffered existing sale, BMK issued to BioStat Purchase Order No. 1557 (herein after Second Purchase Order) on January 31, 2014. The Second Purchase Order memorialized the agreement to place an additional order on behalf of BioStat for 4"x4" and 8"x8" EMS gauze and totaled $85,625. The expected ship date was listed as January 31, 2014 (the date of the purchase order), the terms were "Due on Receipt," and the "Ship To" section of the purchase order provided BMK's address. On February 3, 2014, BMK transferred $42,000 as the down payment on the Second Purchase Order (herein Second Initial Payment) for what was proposed to be an immediate sale to an ultimate user. Thus, BioStat had received a total of $201,080.00, had not shipped any product, and the Court finds that BioStat had no intention to ship any product.

### C. THE INSECURITY

On February 12, 2014, Geier for BioStat emailed both Campbell and Miliken a "Draft Agreement," which sought to memorialize the final contract for consignment, distribution, and sale. The terms of this Draft Agreement were contrary to the First Purchase Order and did not comply with the Second Purchase Order, both of which were accepted and constituted contracts. Campbell and Milken both testified that this draft agreement was never accepted, and that rejection of the agreement as written was communicated to BioStat. The Court has no further evidence as to this rejection. BioStat never sent any product nor ever returned any of the payments made. Clearly BioStat had more than the $85,625.00 on hand which could have been applied to the Second Purchase Order if BioStat which goods were never shipped. It is clear that BioStat never intended to fulfill either contract.

On February 28, 2014, Chad Gibson of BioStat contacted Miliken with the following email, "Your current invoice is attached. Please remit payment upon receipt. We do require payment up front for all goods...." This requirement was contrary to the previously agreed upon

5

contracts. Although BioStat had $201,800 in its pocket, it did not return any funds nor send any product to cover the supposed pre-arranged sales previously referenced in the January 24, 2014 emails between the parties. BioStat did not ship the $85,625 worth of goods referred to in the Second Purchase Order, despite the fact that had BioStat applied part of the initial payment on the First Purchase Order to the payment of the Second Purchase order, it would have met payment in full on the Second Purchase Order and still had $115,455 of the Initial Payments to apply to the outstanding debt on the First Purchase Order. This Court finds as a fact that BioStat itself evidently handled the supposed pre-arranged sales of the Second Purchase Order or that these sales never existed but was merely a ruse get additional monies from BMK. It was not even a bait and switch situation, but rather a bait and total breach.

The Court finds as a fact that both Campbell and Miliken, two of the principals for BMK in the contracting were naïve and inexperienced in the ways of the world. It was obvious to the Court and the Court finds that BioStat was pocketing the money and had no intention of sending the product ordered. Despite significant payment previously sent and accepted, BioStat suddenly demanded up-front payment for the entire product before shipping attempting to significantly alter the terms of the agreement brought about by BMK's order and the agreed down payment. It was clear this was a previously unanticipated alteration, for the requirement of payment in full prior to shipment directly contradicts the need for any reduced initial payment amount to be made.

Shortly after the request for full payment prior to shipment BioStat contacted BMK again in an email on March 3, 2014. The email written by Geier stated, "I need to know asap what is happening here. If payment isn't being made Tuesday then I need a definite schedule." On March 4, 2014, Campbell reached out to BioStat to inform them of the current situation at BMK.

Campbell reported that Miliken and Ernest Lamar, the President of BMK, were in meetings with the bank. Then Campbell went on to state, "I would put a contingency plan in place. If bank won't loan them the full amount they will not be able to provide any funds capital is an issue. They have already committed more than available without a line of credit."

Miliken and Lamar went to the bank to try to get a loan for the remaining amounts due on both purchase orders to BioStat. The Bank would not advance funds without sufficient collateral and with no shipped product there was no collateral to offer. It, like many, had doubts brought about by such large payments previously made with neither product nor any sums returned. The bank clearly was not as naïve as the representatives of BMK.

After the meeting with the bank, Lamar contacted BioStat with the following email,

> We met with our local bank in order to try and secure an additional line of credit for $250,000. After review the bank would not provide us with a line of credit at this time for the additional capital.
> The original monies ($240K) we already sent you were from our reserve capital. This Ties up all capital funds into our potential agreement the bank believed it was to risky to approve at this time. I would like to offer 3 solutions: ...

Lamar offered three options to pursue: (1) sale of only the amount of goods covered by the initial payments and discounted offer of warehousing and shipping of goods if BioStat were to make the remaining purchase of required product, (2) shipment of only the goods covered by the initial payments and a significant reduction in total stocking level, and (3) complete cancelation of the contract.

### D. THE NEGOTIATIONS

BMK, realizing its money was gone with no product received and hoping to save the contracts between the companies, they met at BioStat's facility in Florida to discuss options around March 12, 2014. At the meeting, the Campbell, Lamar, Geier, and BioStat President, Fred Powser, discussed BMK's lack of additional funds, inability to achieve financing without

7

collateral, and the email from Lamar. Specifically, Campbell and Lamar informed BioStat that BMK would be unable to receive financing from their bank unless BMK received at least some inventory. Actual products in inventory were necessary as the bank was demanding a security interest in the held inventory as a condition of an additional line of credit.

BioStat rejected all options offered by BMK, and suggested that BMK meet with a capital investment group, Blackwood. The suggested capital investment group was owned by Geier, Powser, and two additional members not associated with BioStat one of whom was a lawyer. Conveniently, at a break of the meeting between BMK and BioStat, both additional members of Blackwood were called and happened to be easily accessible for a meeting. Shortly thereafter at BioStat's facility a meeting was held between BMK and the BioStat members of Blackwood, and the additional non-BioStat officers of Blackwood. At this meeting, Blackwood offered a line of credit to BMK which would cover the total purchase order amounts, but at a twelve percent (12%) interest rate. BMK determined that the loan would require the company to operate at a loss and rejected the proffered loan.

Thereafter, the parties continued to negotiate in April and May as it was then that BMK wanted the product or return of its money. All options offered by BMK were rejected and negotiations between the parties ceased. No product was ever shipped nor any money ever returned.

On June 27, 2014, a month after BioStat was TCCC certified, BMK through its attorney sent a demand letter requesting the return of the two initial payments from BioStat and informing BioStat that BMK was not in a position to go forward with any business with BioStat. On July 2, 2014, Geier responded on behalf of BioStat advising that BioStat remained ready to fulfill the obligations of the contract, but that BioStat had experienced hardship after BMK informed it of

8

its inability to perform. No offer for return of any of the initial payments was made. The defendant offered no explanation of the supposed "orders in process" of the January 24, 2014 for which BioStat had sought and received $42,000. This Court finds that these "orders in process" were either fulfilled by BioStat during this time or never existed. It finds as a fact that it was a pure "come on" intended to extract money from BMK.

It is notable that BioStat continued the discussions until May 2014 and that in May 2014 BioStat received Tactical Combat Casualty Care ("TCCC") certification. The TCCC certification carried with it the ability to fulfill additional U.S. government contracts for which BioStat had not been previously certified. BMK had been TCCC certified prior to the contracts. This certificate was necessary to gain access to sell to combat units of the U.S. Armed Forces. BioStat products were medical supplies intended to stop bleeding and dress wounds. The certification takes months to obtain. BioStat received its certificate in May 2014; therefore, there was no further reason to use BMK's certification. Odd that only after certification was achieved by BioStat that BioStat claimed breach of the two contracts by BMK and suspended performance. It is clear to the undersigned that Campbell and Miliken were extremely naïve in dealing with BioStat.

## II. CONCLUSIONS OF LAW

The parties are citizens of different states, and the amount in controversy is properly above the threshold $75,000; the Court has jurisdiction pursuant to 28 U.S.C. § 1332. Venue is proper in this District. 28 U.S.C.A. § 1391.

A federal court sitting in diversity must apply the forum state's substantive law. See In re Merritt Dredging Co., Inc., 839 F.2d 203, 205 (4th Cir. 1988) (citing Klaxon Co. v. Stentor Electric Manufacturing Co., 313 U.S. 487, 496 (1941)). In addition, a federal court hearing a state law claim must apply state law in accordance with the forum state's choice of law rules. See

9

In re Merritt Dredging Co., Inc., 839 F.2d 203, 205 (4th Cir. 1988) (citing Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 496 (1941)). In Virginia, questions concerning the performance of a contract are governed by the law of the place of performance of the contract, absent express contractual provision otherwise. See Arkla Lumber & Mfg. Co. v. W. Virginia Timber Co., 146 Va. 641, 132 S.E. 840 (Va. 1926); Va. Code § 8.1A-301. The present contractual arrangement was to be performed in the Commonwealth of Virginia, accordingly, Virginia law applies. As these contracts concern the sale of goods, this suit is governed by the Virginia Uniform Commercial Code—Sales which is codified at Va. Code §§ 8.2-101, et seq.

### A. CONTRACTS

Under the Virginia Uniform Commercial Code ("VUCC"), "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." Va. Code § 8.2-204. Generally to satisfy the VUCC statute of frauds a contract for goods amounting to more than $500 the contract must be made in writing, however, between merchants a writing in confirmation of an oral contract sent within a reasonable time is sufficient to satisfy the requirements for enforcement against both parties so long as the receiving party has reason to know of the contents and makes no objection to the contents of the writing within 10 days of receipt. Va. Code § 8.2-201(2).

Here, both parties were merchants under the applicable code. Va. Code § 8.2-104. As such, upon receipt of the pre-discussed First Purchase Order which this Court finds were sent in confirmation of a contract and operates as an acceptance, thus forming an enforceable contract even though this may have included additional terms. Va. Code § 8.2-207(1). The terms of this first contract were those terms on the face of the First Purchase Order and the terms within the email to which the First Purchase Order was attached. The First Purchase order contained a description of four different products for which quantity ordered, cost per unit, and purchase

price were given. The ship date was listed as January 24, 2014, and the terms included the statement "Due on Receipt," meaning the full of the purchase price would be due only on receipt of the products. BioStat did not ship products on that date or on any date reasonably near that date. The "ship to" section of the purchase order provided BMK's address. The final total price was $397,700. In addition, the email containing the First Purchase Order contained the following terms,

> BioStat will utilize BMK inventory for all orders over 100 units, but on occasional basis fill orders out of limited BioStat inventory.
> BMK will be the only authorized distributor to have on a GSA schedule
> BMK will maintain a quarterly stocking level of $250,000

Between merchants additional terms given in the acceptance, "are to be construed as proposals for addition to the contract. Between merchants such terms become part of the contract unless… notification of objection to them has already been given or is given within a reasonable time after notice of them is received." Va. Code § 8.2-207(2). Many of these additional terms in the email were immediately disputed by Geier. The only the undisputed term was that, "BMK will be the only authorized distributor to have on a GSA schedule." As such, only the undisputed term is construed as part of the contract consisting of the First Purchase order and the email.

By apparent oral agreement between the parties, the deposit or initial payment due on the First Purchase Order was set at $159,080 and was made January 20, 2014. The First Initial Payment was made as fulfilment of this obligation. As the goods were not shipped by the ship date listed on the Purchase Order and the parties continued to perform, the Court understands that there may have been an oral modification of the contract that was accepted by both parties without consideration. Va. Code § 8.2-204. Lacking an actual term by which to perform the contract, the missing term defaults to the applicable code which states, "The time for shipment or

11

delivery or any other action under a contract if not provided in this title or agreed upon shall be a reasonable time." Va. Code § 8.2-309 (1).

On January 31, 2014, BMK issued to BioStat the Second Purchase Order. This was confirmation of a different agreement formed between the parties, and forms a second enforceable contract between them. Va. Code § 8.2-201(2). The Second Purchase Order contained the following clauses: the type of goods, the quantity of goods, the price per unit, the subtotals, the total contract price of $82,625, an expected ship date of January 31, 2014 (the date of the purchase order) as the product in question had allegedly already been sold by BioStat to another and was to be fulfilled by BMK. The payment for the shipment was due on receipt, and the delivery was to be made to BMK's address. Again, the time for action under the contract was missing and was possibly modified; as such, the goods were due within a reasonable time. Va. Code § 8.2-309(1). On February 3, 2014, by oral agreement between the parties BMK transferred $42,000 as an initial payment on the Second Purchase Order. The acceptance of this second initial payment on the Second Purchase order serves to confirm that the remainder of the purchase price would be payable only on receipt, otherwise BMK could not offer collateral to the bank for a loan and there would have been no purpose to an initial payment separate from full payment.

    B.    **INSECURITY DID NOT AMOUNT TO ANTICIPATORY REPUDIATION WITHOUT A DEMAND FOR ADEQUATE ASSURANCE**

On February 28, 2014, the email from BioStat's representative stating, "Your current invoice is attached. Please remit payment upon receipt. We do require payment up front for all goods." This was an attempt to modify the terms of the agreement which clearly stated that both purchase orders were due only on receipt. This email was sent a month after supposed delivery and sale of the products was set to occur according to the two purchase orders.

12

According to Va. Code § 8.2-209, "an agreement modifying a contract within this title needs no consideration to be binding," additionally at Va. Code § 8.2-204, "A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract." As such, when a pre-existing contract is unilaterally modified good faith, is not objected to, and all parties act in accordance with the modification, the modification may stand. As stated previously, in the context of a modification of price made in good faith, "To avoid this predicament, the buyer must at least display some protest against the higher price in order to put the seller on notice that the modification is not freely entered into." U. S. for Use & Benefit of Crane Co. v. Progressive Enterprises, Inc., 418 F. Supp. 662, 665 (E.D. Va. 1976). As such, BMK's attempts to negotiate show a lack of agreement as to the proposed modification, and the Court finds that the contracts between the parties were not modified by this email. Therefore, the payment remained due only on receipt of the goods.

Insecurity regarding BMK's ability to perform on the contract did not amount to anticipatory repudiation of the contract no matter when the payment was due. Under the applicable statute for anticipatory repudiation under the VUCC,

> When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may
> (a) for a commercially reasonable time await performance by the repudiating party; or
> (b) resort to any remedy for breach (§ 8.2-703 or § 8.2-711), even though he has notified the repudiating party that he would await the latter's performance and has urged retraction; and
> (c) in either case suspend his own performance or proceed in accordance with the provisions of this title on the seller's right to identify goods to the contract notwithstanding breach or to salvage unfinished goods (§ 8.2-704).

Va. Code § 8.2-610.

During the period of insecurity, BMK's actions and statements to BioStat did not amount to a rejection of the obligation prior to BioStat's breach. Although BMK indicated a financial hardship in moving forward with the contract without any shipment of goods, it did not state that it would be unable to perform upon the contract. Instead, BMK indicated that shipment of goods could have been used as collateral for the remainder of the funds on receipt. BioStat denied BMK the opportunity to use this method. It never shipped even one piece of the products nor returned one penny of the initial payments. BioStat did not suffer any damages. It is notable that this type of secured financing on collateral is no different that the usage of a mortgage. In everyday life, homes are purchased and payment paid at the time of sale by virtue of a mortgage which provides the excess funds required for payment in return for a security interest in the property, surely this secured financing in inventoried product is no different and could have occurred near simultaneously with the receipt of goods. By informing BioStat that it would only be able to move forward with the contract if some of the product was in inventory, BMK's actions caused by BioStat's change in terms at most gave rise to insecurity not repudiation.

In the absence of any breach by anticipatory repudiation, where the actions of one party give rise to insecurity with respect to performance, "the other may in writing demand adequate assurance of due performance and until he receives such assurance may if commercially reasonable suspend any performance for which he has not already received the agreed return." Va. Code § 8.2-609 (1). This Court finds that even if the statements of BMK regarding the lack of financing gave "reasonable grounds for insecurity arise with respect to the performance," BioStat failed to make a written demand for adequate assurance from BMK and therefore did not have the right to indefinitely suspend performance. Va. Code § 8.2-609. The emails requesting information on when payment would be made and the reply emails in which BMK attempted to

propose modifications to make the contracts advantageous to both parties did not carry with them the full warning or clear force of the code. BMK never received a written demand sufficient to put it as the buyer on notice of potential breach. BMK had no statutory period to respond, awareness of the severity with which BioStat claimed to view the insecurity, and could not anticipate BioStat's intent to move forward and confiscate BMK's funds.

Here, the actions of BMK are merely analogous the buyer in <u>Hess Energy, Inc. v. Lightning Oil Co.</u>, 276 F.3d 646, 650 (4th Cir. 2002). In <u>Hess Energy</u>, the Fourth Circuit held that while the seller was entitled to demand adequate assurances and to suspend performance until the assurances were provided, termination of the contracts was inappropriate without operating under the statutory procedure for demand for adequate assurances. Although BioStat claimed it remained ready to perform, the Court **HOLDS** that in failing to demand adequate assurances from BMK and by suspending the contract indefinitely, BioStat breached by nonshipment of goods within a reasonable time as required under both contracts. As such, the letter written June 27, 2014 in which counsel for BMK informed BioStat that, "BMK is not in a position to move forward on any *future business* with BioStat," was not repudiation of past contracts as previous to this message BioStat had already breached the two contracts for failure to perform, instead it was a statement of finality on all future dealings between the parties. (Emphasis added). As no evidence of reasonable time to perform was presented, this Court holds that the demand letter evincing an understanding in the industry of the time in which a contract is reasonably performed and the absence of performance was therefore the moment of breach for both contracts.

### D. REMEDY FOR SELLER'S BREACH

This Court having found that BioStat breached both contracts between the parties for nondelivery, must determine the appropriate damages applicable under Va. Code § 8.2-711. Under the code, where the seller fails to make any delivery as BioStat did here, BMK is entitled to cancel and recover the price that has been paid. Id. Accordingly, the Court awards judgment in the full amount of the price previously paid under the two contracts amounting to $201,080.00 between the First Initial Payment and Second Initial Payment. Here, BMK failed to present any evidence of cover or damages for nondelivery, and as such the Court will not award any such damages. Id.

### E. OUTSTANDING CLAIMS OF PLAINTIFF FOR UNJUST ENRICHMENT AND TORTIOUS CONVERSION

In the alternative to a breach of contract claim, Plaintiffs allege common law unjust enrichment and tortious conversion. This Court has already found there were contracts governing the parties; as such, BMK's alternative claims to unjust enrichment and tortious conversion are **DISMISSED**. See Rosetta Stone Ltd. v. Google, Inc., 676 F.3d 144, 166 (4th Cir. 2012); Condo. Servs., Inc. v. First Owners' Ass'n of Forty Six Hundred Condo., Inc., 709 S.E.2d 163, 171 (2011).

### III. CONCLUSION

For the reasons stated above, the Court **FINDS** that BioStat breached the contract for sale by nondelivery of goods. As the buyer did not breach by anticipatory repudiation or failure to provide adequate assurance, BMK as the buyer was the aggrieved party for BioStat as the seller's failure to deliver the goods. The breach occurred when BMK sent its demand letter to BMK on June 27, 2014. The Court **AWARDS** to BMK for BioStat's breach of contract recovery of the

price paid in the amount of $201,080.00 under Va. Code § 8.2-711 with interest at six percent per annum from June 27, 2014. Va. Code § 6.2-302.

Having found a contract governing the actions of the parties and breach of the contract by BioStat, this Court consequently **DISMISSES** BMK's alternative claims to unjust enrichment and tortious conversion.

The Clerk is **DIRECTED** to forward a copy of this Order to all counsel of record.

**IT IS SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE

Norfolk, VA
June 3, 2016